**DUVAL COUNTY RANCH CO. et al. v. ROGERS et al.**

No. 10863.

Court of Civil Appeals of Texas. San Antonio.

Feb. 5, 1941.

Rehearing Denied April 16, 1941.

Perkins & Floyd, Jacob S. Floyd, and Frank T. Morrill, all of Alice, Earl A. Brown, of Dallas, Felix A. Raymer, of Houston, Walace Hawkins, of Dallas, and E. E. Townes, R. E. Seagler, and Otis Meredith, all of Houston, for appellants.

George G. Clifton, of San Antonio, Max Clifton and John H. Bickett, Jr., both of Dallas, and T. P. Hull, of San Antonio, for appellees.

NORVELL, Justice.

This is a "vacancy case." Plaintiffs below, Duval County Ranch Company, Magnolia Petroleum Company and Humble Oil and Refining Company, brought this action of trespass to try title against W. S. Rogers, Padua Petroleum Company, Dutex Production Company and others, seeking recovery of title and possession of Surveys Nos. 201, 202, 203, 204 and 205, situated in Duval County, Texas. The petition alleges that said surveys are contiguous to each other and comprise one tract of land which is described by metes and bounds.

Padua Petroleum Company and Dutex Production Company claimed as assignees of an oil and gas lease executed by Wm. H. McDonald, former Commissioner of the General Land Office, on October 21, 1938, which covers 174 acres of land known as W. S. Rogers Survey No. 1 (Rogers being the lessee under the McDonald lease). Rogers No. 1 lies wholly inside the field notes set out in plaintiffs' petition describing the external boundaries of the surveys for which they sued. Said parties disclaimed as to all other lands described in plaintiffs' petition, and set up an alternative claim for improvements made in good faith in connection with their development of the Rogers lease.

Trial was to a jury, but upon the conclusion of the evidence, the trial court instructed the verdict and judgment was entered for plaintiffs against all defendants for the lands described in the petition, except insofar as Rogers Survey No. 1 and Padua and Dutex were concerned. Plaintiffs were denied a recovery against these defendants in this particular, and judgment rendered against plaintiffs and for Padua and Dutex upon their claim under the McDonald lease. The effect of this judgment

882

was to recognize the vacancy asserted by said defendants, and from this part of the judgment plaintiffs have appealed.

Although the statement of facts is very lengthy, containing over 1,200 pages, the case is exceptionally well briefed on both sides and, in our opinion, questions of law only are presented for our determination.

For the sake of clarity, we include in this opinion a reproduction of a part of "Plaintiffs' Exhibit No. 75," which was a map prepared by A. M. French and recorded in the office of the County Surveyor of Duval County in 1881. We refer to this plat as the French map, and have outlined thereon the French surveys, indicated the names of surveyors who located certain surveys in the vicinity, and have designated certain points thereon, F-1 to F-6, to which we hereinafter refer.

Referring to this map, the surveys shown thereon in the heavy black lines are the French surveys which are here involved. To the east thereof lie the Dix surveys (268, 270, 269 and 102 shown on the map) which are senior to the French. To the west of the French are situated the Luckett surveys (260, 262, 106, 102, 100, 95 and 96) which are also senior to the French. Surveys Nos. 363, 362, 359 and 360 were surveyed by Dix. These surveys are also senior to the French.

On September 27, 1879, N. G. Collins, as the owner of 12½ certificates of land scripts (640 acres each) filed application with A. M. French, County Surveyor of Duval County, requesting that these certificates be located on the unappropriated public domain. The formal application, probably prepared by French, specified that the area lying between the Dix and Luckett be taken up in the locations, as well as certain other parts of the public domain lying to the east and south of Dix Survey No. 102.

French in carrying out the instructions of the application, started at the northeast corner of Survey 41 (not shown on the French map. This point is on the south boundary line of Survey 359) and ran 477 varas to the southeast corner of Survey 359, thence north 1,900 varas to the northeast corner of 359, thence east 1,423 varas to a point on the north line of Survey 360, where he set a stake. This point, for convenience, we refer to as F–1. French then ran north an actual distance of 2,111 varas to a point (F–2) which he monumented, his distance call however was only 1,900 varas. From this point he continued north 1,898.8 varas (call 1,900 varas) and set another stake (F–3). He continued north 2,173.9 varas (call 1,900 varas) where he set a stake (F–4). He then ran east to the west line of Survey 102 (F–5), and thence north 1,215 varas to a monument set by Dix (F–6). This constituted all the actual work done by French upon the ground in connection with the location of lands under the Collins application. The information obtained by French as a result of running the line above mentioned, together with field notes prepared by Dix for his surveys to the east, and maps and field notes relating to senior surveys in the vicinity, enabled him to compute acreage and distance, and thus prepare field notes for the various surveys to be located between Dix on the east and Luckett on the west.

It seems obvious that the purpose of the running of the line from the north boundary of Survey 360 (F–1) to the Dix monument on the west line of Survey 102 (F–6) was to enable him to ascertain with the aid of the Dix field notes for the east Dix surveys, the distance north he would have to go in order to establish the northernmost boundary of his surveys in order to obtain the required acreage; the north survey being afterwards located as No. 199.

French, in preparing the field notes for his surveys, did refer to the various monuments he had personally set in running his line, as well as the Dix monument in the west boundary line of Survey 102 and adopted the same as corners of certain of the surveys which he prepared under the Collins application.

We may refer to the line run by French, F–1 to F–6, as the French line; the line to the north from F–6, evidenced by the corners and monuments of the Dix surveys, as the Dix line, and the two together as the French-Dix line. The line to the west of the French surveys, evidenced principally by the corners and monuments of the Luckett surveys, may be referred to as the Luckett line.

At the time French made his survey for Collins he probably made use of certain maps which were inaccurate, in that they did not show the true relative position of the Luckett surveys on the west with reference to the Dix surveys on the east; the Dix surveys being shown on the maps as occupying a position further to the south in reference to the Luckett surveys than they actually occupied on the ground. This was probably the result of a miscalculation of a tie call by Dix, which was used in platting the maps. As above pointed out, French made an error in chaining from F–1 to F–4 of 483.7 varas, and this error, by a strange coincidence, apparently tended to confirm the accuracy of the maps platted on Dix's erroneous tie computation, the error in that particular being approximately 480 varas. The result of these mistakes was that the northings in the French-Dix lines (F–1 to N. E. corner of 199) were greater by about 483 varas than the northings of the Luckett or west line (S. W. corner 362 to N. W. corner of 199).

As above pointed out, the only actual work done by French upon the ground was the running of the French line. The lands located under the Collins application were platted and field notes prepared by French

upon the erroneous belief as to the relative position of the Dix and Luckett surveys, for instance, he believed the south line of Luckett Survey No. 100 was an extension of the south line of Dix Survey No. 102; that point F–3 lay due east of the southwest corner of Luckett Survey 100, and that point· F–4 lay due east of the southwest corner of Luckett Survey No. 102. In the field notes prepared, French calls for various points and corners in the Luckett surveys under this assumption.

■ For the purposes of discussion, we paraphrase and divide appellants' first proposition of law, which is based upon the set of facts above outlined and asserts:

First: "The field notes and map of the Collins Surveys prepared and filed by French, embracing, as they do, within their external boundaries all unappropriated public lands lying between the senior Dix and Luckett surveys to the east, west and south, French's whole work constituted, in law and in fact, one piece of work and one survey;"

Second: That the foregoing being true, the internal lines within the external boundaries of the whole, become immaterial to any issue in this cause for the "approval by the Land Commissioner of the. French field notes and maps of 1880, operated to segregate from the unsurveyed. public domain all lands embraced within their external boundaries, the title to which has passed out of the State of Texas and is now invested in these appellants. The internal lines, therefore, within the external boundaries of the whole, become immaterial to any issue in this cause for the State of Texas was without right or title to any lands lying between the Dix and Luckett surveys to the east, west and south when the lease was made by McDonald to W. S. Rogers on October 21, 1938."

As counter to the first point above stated, appellees contend that "Without question, the work in laying out Surveys 199, 200, 201, and 202 was entirely different, separate, and distinct from the work in laying out Sections 203, 204, 205; the one is based entirely upon prior existing maps, plats, and field notes; the other, upon actual field work."

Appellees' position here can not be sustained. The mere fact that French ran the line hereinabove indicated and thereafter in making an office survey of the area here involved, made use of monuments previously set in the line, will not support the theory that Surveys 203, 204 and 205 are to be governed by rules applicable to surveys where all lines were actually run with corners established on the ground. The points actually monumented by French will of course be recognized, but this does not mean that work on the southern part of the French surveys will be recognized as one block or system, while the north surveys will be considered as an entirely different system of surveys. We therefore hold that the French surveys in the area involved constitute one system or block of surveys, and further that they were primarily office surveys, and the issue here involved is to be determined by rules applicable to such situations.

We pass to the second point of appellant's proposition. There is no doubt that the external lines of the French system of surveys (as determined from the field notes of the surveys) embrace within their external boundaries the 174 acres known as Rogers Survey No. 1. French's map of his surveys (plaintiffs' exhibit 75) . supra, strongly indicates that his intention was to appropriate all lands lying between the Dix and Luckett surveys.

Appellants' position here is strongly supported by the authorities. See Clement v. Packer, 125 U.S. 309, 327, 8 S.Ct. 907, 915, 31 L.Ed. 721, 728, construing the law of Pennsylvania. Standefer v. Vaughan, 219· S.W. 484, by the Amarillo Court of Civil Appeals, holding, in effect, that the doctrine of Clement v. Packer obtains in Texas. Beck v. Gulf Production Company, 113 S.W.2d 258, writ refused, in which the El Paso Court of Civil Appeals cites Standefer v. Vaughan as announcing a settled rule of construction applicable to systems or blocks of surveys. See also State v. Coleman-Fulton Pasture Co., 230 S.W. 850, by this Court, also Ferguson v. Bloom, 144 Pa. 549, 23 A. 49.

■ The rule stated in Standefer v. Vaughan, supra [219 S.W. 489], is that "Surveys constituting a block are not to be treated as separate and individual surveys; nor can each tract be located independently of the rest, by its own individual lines or calls or courses and distances, but such surveys are to be located together as one block or one large tract. * * *"

■ This rule or a corollary thereto, stated in terms particularly applicable to the situation before us is that in construct-

-ing a series of surveys, comprising one system or block, from field notes prepared for the individual surveys included in the block, inconsistent theories of construction can not be employed as to individual surveys so as to create a vacancy within the block.

As we understand it, appellees' position is not in conflict with the rule or proposition above stated, but is based upon the contention that there are two blocks or systems instead of one involved in this action.

In order to make clear the application of the rule above stated when applied to the facts of this case, we show a sketch of the surveys here involved.

The solid lines running east and west taken together with the solid north and south lines represent a theory of possible construction advanced by appellants. This theory involves recognition of all calls to the Luckett line and points necessarily located with reference thereto. The dotted east and west lines taken with the north and south lines represent the theory of construction propounded by Dellis, appellees' surveyor. (Dellis found another vacancy near the southeast corner of Survey No. 200, which is not shown as it is immaterial to any matter here involved.)

The Dellis theory of construction of the north surveys (Nos. 199, 200, 201 and 202) is that the Dix line is controlling, that French was mistaken as to the location of points called for in the Luckett line, and, therefore, these calls should be disregarded and the lines to the west established by course and distance under the holdings of Turner v. Smith, 122 Tex. 338, 61 S.W.2d 792, and State v. Sullivan, 127 Tex. 525, 92 S.W.2d 228.

In constructing the southern surveys (Nos. 203 and 204) Dellis changes his theory and agrees with appellants in recognizing calls to the Luckett. This gives rise to the vacancy. [1]

■ We have held that only one system or block is involved. It follows that the French-Dix line on the east is one line, and that no legitimate distinction can be drawn between the part run by French and the line established by Dix's monument and corners. It follows that inconsistent methods of construction of surveys from said line can not be employed to create vacancies within the system. A contrary holding would violate the rule that "surveys constituting a block are not to be treated as separate and individual surveys."

■ We are not called upon here to decide the correct methods of construction

[1] Dellis' construction of survey 202 is obviously incorrect, as it involves a change in controlling theory in constructing the lines of one survey. The N. E. and S. E. corners are established from the Dix line, while the Luckett is honored for the N. W. and S. W. corners. This, although Dellis refused to honor the Luckett for the S. W. corner of survey No. 200. It is suggested in appellees' brief, in accordance with their theory of two blocks or systems, that the south line of 202 should properly be located without reference to the beginning call in the Luckett (N. E. corner of survey No. 100). However, under this theory (as well as the Dellis theory) it would be necessary to dishonor the call in the field notes for survey No. 203, which place the N. E. corner thereof in the south line of survey No. 202.

A similar situation exists on the east. Dellis gives controlling effect to the Dix line in constructing survey No. 201. In establishing the lines of survey No. 204, however, the northeast corner of Luckett No. 96, designated as the beginning point in the field notes, is honored and the

of the outside boundaries of the French block, nor the lines of any particular survey therein, but only whether or not there is a vacancy as alleged by appellees. We hold that there is no such vacancy. That part of the judgment of the trial court denying appellants a recovery of the tract of land embraced within the field notes of W. S. Rogers Survey No. 1, is reversed and judgment here rendered (upon the basis of our holdings herein and appellees' disclaimers in the court below) that appellants recover of and from appellees the title and possession of the lands and premises described by metes and bounds in appellants' trial petition. This cause insofar as it relates to appellees' alternative claim (improvements placed upon the property in good faith) is remanded to the trial court for its consideration and determination.

Judgment in part reversed, in part rendered, and in part remanded.

### On Motion for Rehearing.

Appellees, in their motion for rehearing, contend (1) that as appellants caused re-surveys to be made of Survey No. 100 (Luckett) and Survey No. 204 (French) and accepted patents thereon, they are bound by the north boundary lines of Surveys Nos. 203 and 204 established thereby under the rule announced in Dikes v. Miller, 24 Tex. 417; Miller v. Yates, 122 Tex. 435, 61 S.W.2d 767, and similar cases; (2) that upon authority of Turner v. Smith, 122 Tex. 338, 61 S.W.2d 792, and State v. Sullivan, 127 Tex. 525, 92 S.W.2d 228, calls to the Luckett should be rejected in construing the field notes of Surveys Nos. 199, 200, 201 and 202, and controlling effect given to calls for course and distance; and (3) finally, that when the rules above suggested are applied, there exists a vacancy which is occupied in whole or in part by the W. S. Rogers Survey No. 1.

As stated in the original opinion, the map prepared by French indicates that the north boundary line of Surveys Nos. 203 and 204 is also the south boundary line of Surveys Nos. 201 and 202. The French field notes of the surveys involved also show that it was the surveyor's intention to establish a common boundary line between Surveys Nos. 201 and 202 on the north and Surveys Nos. 203 and 204 on the south. As pointed out in the footnote to the original opinion, the field notes of Survey No. 203 place the northeast corner thereof in the south boundary line of Survey No. 202. This clearly demonstrates French's intention to establish a common boundary line between Surveys Nos. 202 and 203.

In the French field notes for Survey No. 201, the call establishing the South boundary line of said survey is west 1,663 varas from the S. E. corner.

The original field notes of Survey No. 204 call for the northern boundary thereof to run west (French's call for course reversed) 1900 varas from Point F–4.

French's field notes of Survey No. 205 begin at Point F–3, run north to F–4, the northeast corner of Survey No. 204, "thence West 154 varas to S. E. Cor. of Sur. No. 201." The southeast corner of Survey No. 201, according to the field notes, therefore lies due west of Point F–4, and therefore calls for a west course from either F–4 or the southeast corner of Survey No. 201, are calls for an identical line. French's field notes therefore indicate his intention to establish a common boundary line between 201 on the North and 204 on the South.

In 1937, Survey No. 100 (a Luckett survey, not involved in this suit) was patented upon field notes of a re-survey made by Hayes Dix, a son of J. J. Dix, who located the Dix surveys mentioned in the original opinion. In 1939 another survey of Luckett No. 100 was made and a corrected patent issued. In 1937, a patent to Survey No. 204 was issued, based upon a re-survey thereof made by Hayes Dix the preceding year. Appellees contend that by accepting patents upon the field notes of these re-surveys, the north line of Survey No. 203 (which was patented upon the original French field notes) was fixed as a line

---

S. W. and N. W. corners of survey No. 204 established therefrom. The S. E. and N. E. corners of the survey are established by the French monuments F–3 and F–4.

If in constructing the French system of surveys throughout (in the area here involved) controlling effect be given to the French-Dix line and the lines to the west run by course and distance, disregarding calls to the Luckett, no vacancy exists in the area claimed by appellees. Similarly, if calls to the Luckett be honored over course and distance throughout the system, no vacancy exists in the area occupied by W. S. Rogers No. 1.

running from the northeast corner of Survey No. 100, as established by the 1937 patent (or in the alternative by the 1939 corrected patent which was issued subsequent to the date of the Rogers lease) to the northwest corner of Survey No. 204 as established by Hayes Dix in 1936. We doubt if the rule of Miller v. Yates, supra, has application to Survey No. 203, which was patented upon the original French field notes, but if the re-surveys of adjacent sections can be regarded as fixing the north boundary line of Survey No. 203, then the same situation would be presented as to Surveys Nos. 202 and 203, as exists with reference to Surveys Nos. 201 and 204, because of Hayes Dix' 1936 re-survey of No. 204.

In making this re-survey (of No. 204) Hayes Dix began at Point F–4, ran south 0° 06' E. to point F–3. He then honored French's call to the Luckett (northeast corner of Survey 96, French's beginning point). Dix' course here is S. 83° 57½' west. French's course was due west. Dix then went North 0° 20' W. 1,938.2 varas to a point which he describes as the northeast corner of Survey No. 203, in the south line of Survey No. 202, for the northwest corner of Survey No. 204. The next call is "thence North 77° 10½' E (French's course call being due east) with the South line of Survey 202 and 201, 1977.8 varas to the place of beginning." It is apparent that Hayes Dix honored French's calls to the Luckett over the calls for course and distance.

Appellees would construct the north French surveys (199, 200, 201 and 202) by honoring course and distance over calls to the Luckett, thus creating a vacancy.

We adhere to the holding expressed in our original opinion that the French surveys in the area here involved constitute one block or system of surveys. We are also of the opinion that the issuance and acceptance of patents upon the re-surveys above mentioned must be regarded as immaterial in arriving at a proper disposition of this case. We are here concerned with interior and not external lines of a system or block of surveys.

In Gulf Oil Corporation v. Outlaw, 150 S.W.2d 777, the Supreme Court of this State had under consideration a case which in certain particulars is similar to that presented here. In the Outlaw case the vacancy involved was allegedly located within the outside boundaries of a block or system of surveys. An attempt was made not to recover an excess, but "to tear apart surveys shown upon the official plat of the surveyor to adjoin each other and to establish a vacancy between such surveys." It also appeared that both Sections Nos. 22 and 27 (the supposed vacancy lay between these two sections) were owned by Clarence Scharbauer, one of the parties to the suit.

We quote from Judge German's opinion, which was adopted by the Supreme Court:

"The land in controversy is the long narrow strip indicated by letters A B C and D [upon the map shown in the opinion]. It is the contention of the State and defendant Outlaw that it was, prior to the resurvey, a part of Section 22; that as the surveyor in making the resurvey actually stopped at the point A, then ran to the point D, this became the south boundary line of the survey, leaving the narrow strip vacant land; that as Buchanan [Scharbauer's predecessor in title] accepted a patent based upon this resurvey, under the rule announced in Holmes v. Yates, 122 Tex. 428, 61 S.W.2d 771, and Miller v. Yates, 122 Tex. 435, 61 S.W.2d 767, he could not claim title to said strip.

"The Court of Civil Appeals reversed and remanded the case, holding that the evidence was sufficient to raise an issue of fact that the iron pipe found at point A was placed there by Wadsworth in resurveying Section 22, thus fixing with certainty his footsteps, and that if a jury so found, the strip of land in controversy would be shown to be a part of the public domain, subject to the Outlaw permit.

"Iron stakes, such as were called for by Wadsworth, were found at several different places. While there may be an inference that Wadsworth placed the iron pipe at point A, yet *we have concluded that as a matter of law there were common corners and a common line between Section 22 and Section 27, and the only controversy (if any) which could exist is as to the true location of said corners and line.*" (Italics ours.)

Further in the opinion, it is said:

" * * * It is our opinion that the plain interpretation of the field notes made by the surveyor leads to the inevitable conclusion that these surveys were all tied together, and that Section 22 and Section 27 have common corners and a common line.

It thus appeared on the map which Wadsworth made. It is not necessary to resort to rules of construction, as the field notes speak for themselves. It seems to us unquestionable that if any doubt whatever arises *it is as to the location of this common line. The evidence might possibly raise an issue of fact in that regard, but we believe it immaterial even if it does."* (Italics ours.)

We conclude therefore that at most the acceptance of patents by appellants based upon the re-surveys mentioned, simply fixed and determined the *common boundary line* between Surveys Nos. 201 and 202 on the north and Surveys Nos. 203 and 204 on the south. It did not operate to tear the surveys apart and establish a vacancy between them. As appellants are the owners of all of the surveys here involved, the true location of the boundary lines between them is immaterial, as is the question of the correctness of the theory employed by Hayes Dix in constructing Survey No. 204 from the original field notes prepared by French.

After careful consideration, we are of the opinion that our original disposition of this appeal was correct, and appellants' motion for rehearing is accordingly overruled.